# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF AARON SETH JUÁREZ | Case No. 1:24-mj-00079-SAB<br><br>MEMORANDUM AND ORDER CERTIFYING EXTRADITABILITY<br><br>(ECF Nos. 18, 19, 20, 21) |

## I.

## INTRODUCTION

On July 9, 2024, the United States of America ("the Government") filed a complaint seeking the extradition of Aaron Seth Juárez ("Juárez") at the request of the United Mexican States ("Mexico") pursuant to the Extradition Treaty between the United States of America and Mexico.[1]

Juárez is alleged to have shot and killed his stepmother ("the decedent") at her home in Tijuana, Mexico on February 5, 2019. (ECF No. 1.) On March 1, 2019, following a hearing before a Constitutional Rights Court Judge of the Judicial Branch for the State of Baja California, seated in the City of Tijuana, an arrest warrant was issued for Juárez for his probable

---

[1] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, as amended by the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S.TREATY DOC. NO. 105-46 (1998) ("the Treaty"). (ECF No. 18 at 31-68).

participation in the commission of the crime of femicide, as provided for and penalized by Article 129 of the Criminal Code of the State of Baja California, Mexico ("Baja Criminal Code"). (ECF No. 18 at 3-30.)

On February 27, 2023, Mexico submitted a formal request to the United States pursuant to the Treaty to extradite Juárez to face a charge of femicide. (Id.)

On July 9, 2024, the Government filed a complaint against Juárez pursuant to 18 U.S.C. § 3184, and an arrest warrant issued the same day. (ECF No. 1.) Juárez was arrested while in the custody of the Bureau of Prisons at the United States Penitentiary, Atwater, where he is serving a sentence for an unrelated offense. (ECF No. 19 at 16.) On August 2, 2024, Juárez appeared for his initial appearance on the complaint for extradition to Mexico. (ECF No. 5.)

On August 7, 2024, the Government filed a redacted version of the extradition request and supporting documents. (ECF No. 11.) At an October 16, 2024 status conference, an order issued setting a briefing schedule with an extradition hearing set for February 4, 2025, which was later continued to February 19, 2025. (ECF Nos. 14, 22.) On January 7, 2025, the Court granted the Government's request to file under seal an unredacted version of the extradition request and supporting documents (ECF Nos. 15, 16), which were filed under seal the same day (ECF No. 18). On January 7, 2025, the Government filed a memorandum in support of extradition. (ECF No. 19.) Juárez filed an opposition on January 21, 2025. (ECF No. 20.) The Government filed a reply to Juárez's opposition on January 28, 2025. (ECF No. 20.)

An extradition hearing was held before the undersigned on February 19, 2025. (ECF No. 24.) Counsel Dhruv Sharma appeared for the Government. Counsel Reed Grantham appeared with Juárez who was in custody. The Government moved to admit the extradition package (ECF Nos. 11, 18) into evidence. The exhibits were admitted without objection.[2]

Having considered the moving, opposition, and reply papers, the extradition package, the record, and the arguments presented at the February 19, 2025 hearing, the Court finds, for the

---

[2] Juárez does not challenge that the documents submitted in support of extradition comply with the Treaty. Upon review of the documents, the Court finds that they comport with the Treaty requirements, have been certified by the principal consular officer of the United States of America in Mexico, and are properly authenticated under the law of the United States. 18 U.S.C. § 3190; (ECF No. 18 at p. 2, ¶ 6).

following reasons, that the Government has satisfied its burden under 18 U.S.C. § 3184 and has established that Juárez is eligible to be extradited to Mexico.

## II.

## LEGAL STANDARD

"Extradition from the United States is a diplomatic process that is initiated by a request from the nation seeking extradition directly to the Department of State." Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005). Extradition requests are evaluated by the State Department to determine whether the request falls within scope of the relevant extradition treaty. Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016); Prasoprat, 421 F.3d at 1012. If the request falls within the treaty, a United States Attorney files a complaint in the district court seeking an arrest warrant for the person sought to be extradited. Santos, 830 F.3d at 991; Prasoprat, 421 F.3d at 1012.

"Extradition from the United States is governed by 18 U.S.C. section 3184, which confers jurisdiction on 'any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States' to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.' " In re Extradition of Santos, 795 F.Supp.2d 966, 969 (C.D. Cal. 2011). The judge is to hold a hearing to determine "whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge." Prasoprat, 421 F.3d at 1012.

The Court has limited authority in the overall extradition process as "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006) (quoting Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir. 1997)). The Court does not consider whether the extraditee is guilty, but merely whether there is competent legal evidence which would justify holding the individual for trial. Collins v. Loisel, 259 U.S. 309, 315-16 (1922).

In the extradition hearing, there are no discretionary decisions for the judge to make. Prasoprat, 421 F.3d at 1012. If the judge "deems the evidence sufficient to sustain the charge

1    under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify

2    the same, together with a copy of all the testimony taken before him...." 18 U.S.C. § 3184. It is

3    within the discretion of the Secretary of State to determine whether the individual will be

4    surrendered. Prasoprat, 421 F.3d at 1012.

5    **III.**

6    **DISCUSSION**

7    "Foreign states requesting extradition are not required to litigate their criminal cases in

8    American courts[;] and therefore, "the scope of the extradition court's review 'is limited to a

9    narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of

10   evidence offered.' " Santos, 830 F.3d at 991. "The larger assessment of extradition and its

11   consequences is committed to the Secretary of State." Id. (quoting United States v. Kin–Hong,

12   110 F.3d 103, 110 (1st Cir. 1997). To obtain a certification of extraditability on behalf of

13   Mexico, the United States has the burden of demonstrating each of the following elements:

14
15   (1) the court possesses subject matter jurisdiction to conduct
     extradition proceedings; (2) the court possesses personal
     jurisdiction over the person named in the extradition request; (3) a
16   valid extradition treaty exists between the requesting state and the
     United States; (4) the extradition treaty between the requesting
17   state and the United States is, and at all relevant times has been, in
     full force and effect; (5) the person named in the extradition
18   request is charged with having committed a criminal offense
     within the jurisdiction of the requesting state; (6) the charged
19   offense is extraditable under the relevant extradition treaty (that is,
     the offense charged falls within the terms of the relevant
20   extradition treaty); (7) the person named in the extradition request
     is the person arrested and brought before the court; and (8) there is
21   competent evidence establishing probable cause to believe that the
     person named in the extradition request committed the charged
22   offense.

23   In re Extradition of Santos, 795 F.Supp.2d at 969-70 (citing 18 U.S.C. §§ 3184, 3190).

24   Based on the parties' submissions and arguments at the extradition hearing, the only

25   disputed element for a certification of extraditability is probable cause. The Court therefore only

26   briefly addresses the other elements.

27   **A.    Subject Matter Jurisdiction**

28   This Court has subject matter jurisdiction over, and the undersigned is authorized to

conduct, extradition proceedings pursuant to Title 18 U.S.C. § 3184 and Local Rule 302(b)(8).

**B.    Personal Jurisdiction**

"A district court has jurisdiction over a fugitive found within its jurisdictional boundaries."  In re Extradition of Camelo-Grillo, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017) (citing 18 U.S.C. § 3184 ("a judge "may, upon complaint made under oath, charging any person found within his jurisdiction...")).  Juárez was "found" in this District while an inmate at United States Penitentiary, Atwater.  (ECF No. 1 at 9.)  Accordingly, the Court has personal jurisdiction over Juárez to determine his extraditability pursuant to 18 U.S.C. § 3184.

**C.    A Valid Treaty Exists that Has Been In Full Force and Effect**

The Ninth Circuit instructs that courts should defer to the decisions of the State Departments of the two countries in determining the continuing validity of an extradition treaty.  Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996).  In support of extradition, the Government has submitted a declaration by Tom Heinemann, the Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.  (ECF No. 18 at 1-2.)  Mr. Heinemann states that the Treaty between the United States and Mexico is in full force and effect.  (Id. at 1, ¶ 2.)  Accordingly, the Court finds that a valid extradition treaty between the United States of America and Mexico is, and at all relevant times has been, in full force and effect.

**D.    Identity**

The Government provides documentation, including the Mexican arrest warrant, that Juárez has been charged with femicide, as punishable by Article 129 of the Baja Criminal Code, for the alleged killing of his stepmother in Tijuana, Mexico.  (ECF Nos. 1, 18 at 3-30.)  The Court finds the Aaron Seth Juárez sought by the Mexican authorities and the Aaron Seth Juárez arrested in this District for extradition and brought before this Court are one and the same person.  Juárez admitted his identity at his initial appearance on August 2, 2024 and does not deny he is the person named in the extradition request.

**E.    Extraditable Offense**

The Government must prove Juárez is charged with having committed a criminal offense

within the jurisdiction of Mexico and that the offense charged is an extraditable offense covered under the Treaty.  In re Extradition of Santos, 795 F.Supp.2d at 969-70. Under the principle of dual criminality, "no offense is extraditable unless it is a crime in both jurisdictions."  Emami v. U.S. Dist. Ct. for N. Dist. of California, 834 F.2d 1444, 1449 (9th Cir. 1987) (quoting Caplan v. Vokes, 649 F.2d 1336, 1343 (9th Cir. 1981)).  "It is well established that all the principle of dual criminality requires is that the particular acts alleged constitute a crime in both jurisdictions."  Emami, 834 F.2d at 1450.  Neither the name of the crime nor the scope of liability is required to be coextensive or the same in both countries.  Id.

Article 2 of the Treaty provides for extradition for willful acts if they are (1) listed in the Appendix and punishable under the laws of both countries by deprivation of liberty of at least one year; or (2) not listed in the Appendix but are punishable the laws of both countries by deprivation of liberty of at least one year.  Extradition Treaty, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059.  The Appendix lists 31 extraditable offenses, including "murder or manslaughter." Id.

The Court finds femicide is an extraditable offense covered under the Treaty.  The crime of femicide under Article 129 of the Baja Criminal Code "is committed by whoever intentionally deprives one or more women of their life for gender-related reasons."  (ECF No. 18 at 103.) Gender-related reasons are presumed to exist where there has been "a relationship of kinship or affinity" or "any other relationship that entails trust, subordination or hierarchy between the active party and the victim"; or where the victim was "inflicted infamous, degrading or mutilating injuries prior to or subsequent to death."  (Id.)  Thus, femicide in Mexico is the murder or manslaughter of a woman for a gender-related reason.  See Appendix to 31 U.S.T. 5059.

In determining whether the conduct would be a crime in the United States so as to satisfy the dual criminality requirement, courts look to "similar criminal provisions of federal law or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states."  Cucuzzella v. Keliikoa, 638 F.2d 105, 107 (9th Cir. 1981).  The Court finds that the offense which Juárez was charged in Mexico, intentionally shooting and killing a woman, would

be a crime under the laws of the United States as a violation of 18 U.S.C. § 1111[3] or under California law as a violation of Penal Code § 187[4].

Additionally, the laws in both countries punish the charged offense by at least one year imprisonment. Pursuant to the Baja Criminal Code, Juárez faces a sentence of imprisonment of thirty to sixty years if convicted of femicide.  (ECF No. 18 at 11, 97.)  In the United States, a federal charge of homicide pursuant to 18 U.S.C. § 1111 and a murder charge pursuant to California Penal Code § 187 are punishable by a penalty of a term of years to life imprisonment. 18 U.S.C. § 1111(b); Cal. Pen. Code § 190(a).  Accordingly, the Court finds Juárez's charged conduct constitutes an extraditable offense under the terms of the Treaty.

### F.    Probable Cause

An extradition proceeding is not a trial.  Emami, 834 F.2d at 1452.  "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  Collins, 259 U.S. at 316.  Probable cause is established if "there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988).  Here, Juárez argues that the evidence submitted by Mexico is not competent for the Court to find probable cause exists.

1.    Evidence Submitted in Support of Extradition

a.    Statement of A.J.V.L.

On March 6, 2019, Mexican authorities conducted an interview of A.J.V.L.  (ECF No. 18 at 118-22.)  In her statement, A.J.V.L. stated that in the early hours of February 5, 2019, A.J.V.L. went to Juárez's house.  (Id. at 120.)  By approximately 6:00 a.m., one of Juárez's friends,

---

[3] Pursuant to 18 U.S.C. § 1111, "[m]urder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by…willful, deliberate, malicious, and premeditated killing...is murder in the first degree. Any other murder is murder in the second degree." 18 U.S.C. § 1111(a).

[4] Under California law, murder is the unlawful killing of a human being with malice aforethought.  Cal. Pen. Code § 187(a). "[M]alice may be express or implied. (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Cal. Pen. Code § 188(a). All murder that is perpetrated…by any other kind of willful, deliberate, and premeditated killing…is murder of the first degree. Cal. Pen. Code § 187(a). All other kinds of murder are of the second degree.  Cal. Pen. Code § 187(b).

1   Christopher Rodrigo Coronado, arrived. (Id.) A.J.V.L. heard Juárez and Coronado planning

2   something. (Id.) Juárez told Coronado that he would let him know where the money was but

3   told Coronado to first wait in the white jeep parked in the backyard because Juárez and A.J.V.L.

4   were going to have sex. (Id.) Juárez went outside with Coronado and the decedent appeared in

5   Juárez's bedroom, asking A.J.V.L. what she was doing there. (Id.) A.J.V.L. told her she was

6   visiting. (Id.) The decedent told A.J.V.L. that it was not the proper hour for a visit. (Id.) Juárez

7   then returned and began to argue with the decedent. (Id.) Juárez told the decedent to stay out of

8   his business and the decedent told Juárez she was going to talk to his father because it was not

9   okay to have young girls in the house. (Id.) Although they continued in English, A.J.V.L.

10  understood they were arguing because they were yelling at each other. (Id.)

11      A while later, A.J.V.L. and Juárez were sitting on his bed when A.J.V.L. heard the

12  decedent turn on the television in another room. (Id.) Juárez took a gray handgun out of a

13  drawer. (Id.) A.J.V.L. asked what he wanted the gun for, and he replied, "you're about to see."

14  (Id.) Juárez left the bedroom. (Id.) After hearing a door slam, A.J.V.L. exited the bedroom,

15  stood in the hallway, and noted how Juárez and Coronado were coming in without saying a

16  word. (Id.) Juárez then aimed the gun at the decedent as she was sitting on the couch, then shot

17  the decedent by her eye. (Id. at 120-21.)

18      Juárez told A.J.V.L. and Coronado to go to his bedroom and get comforters to cover the

19  decedent. (Id. at 121.) Juárez threatened A.J.V.L. not to say anything or yell. (Id.) Juárez and

20  Coronado wrapped the decedent in a white blanket and then a brown blanket. (Id.) Juárez,

21  Coronado, and A.J.V.L. went to the backyard and the men began to dig a hole with a shovel and

22  pickaxe in front of a white Volkswagen without a grill. (Id.)

23      Juárez said he was going to get lime and told Coronado to watch A.J.V.L., threatening to

24  have them both killed if they left. (Id.) Juárez returned with four bags of lime and threw it in the

25  hole. (Id.) Juárez left again and returned with another four bags of lime. (Id.) Juárez and

26  Coronado attempted to carry the decedent's body, but it was too heavy. (Id.) Later, Juárez

27  returned with a person named Isaac, and the three men loaded the decedent's body into a

28  wheelbarrow, put the decedent's body in the hole, and poured lime and dirt on top. (Id. at 121-

22.) The three men then pushed the Volkswagen on top of the hole. (Id. at 122.)

Juárez went into the house and, with Coronado's help, began taking things out of the house and placing them in the cars parked outside. (Id.) He also told Coronado and Isaac to take vehicles from the property. (Id.) Juárez dropped A.J.V.L. off at a store and threatened her not to say anything. (Id.) Afterwards, Juárez came looking for her twice, which made A.J.V.L. fear for her and her family's safety and prompted her to report the incident to the police. (Id.)

**b.    Statement of Christopher Rodrigo Coronado**

On February 25, 2019, Mexican authorities conducted an interview of Coronado. (ECF No. 18 at 110-16.) In his statement, Coronado stated that on February 4, 2019, Juárez asked Coronado to help him steal $5,000 and cars from his relative's house to which Coronado agreed. (Id. at 112.) At approximately 6:00 a.m. on February 5, 2019, Juárez and A.J.V.L. picked Coronado up and drove him to a house where Juárez's father and stepmother lived. (Id. at 112-13.) Juárez pointed to two vehicles, including a white Jeep Cherokee, and told Coronado those were the vehicles they were going to steal. (Id. at 113.) He also told Coronado that the Jeep belonged to his stepmother and that she was inside the house. (Id.) Juárez instructed Coronado to get into the Jeep and wait until he called him. (Id.) Juárez then went inside the house to have sex with A.J.V.L. and to investigate his stepmother's whereabouts. (Id.)

Approximately a half hour later, Juárez came outside and showed Coronado a silver handgun. (Id.) Juárez told Coronado he would kill his stepmother with the gun because he was "sick of her" and because he wanted to stay with his father and keep the house and cars. (Id.) Coronado tried to dissuade him, but Juárez responded that he was determined to do it. (Id.)

Coronado went into the house with Juárez and saw the decedent sitting on the couch looking at her cell phone. (Id.) Coronado saw Juárez walk over and, without saying anything, shoot the decedent in the face near her eye. (Id.) Coronado heard A.J.V.L. tell Juárez that she thought he was going to do it at night, when his father got home. (Id.) Juárez replied that he did it in advance and that he would tell Coronado to kill his father when his father came home. (Id. at 114.) Juárez aimed the gun at Coronado and asked if he was going to back out. (Id.) Coronado responded that he would do whatever Juárez told him because he thought Juárez

would shoot him.  (Id.)

Juárez asked A.J.V.L. to grab a blanket and she returned with two, a white one and a beige one.  (Id.)  Juárez, A.J.V.L., and Coronado went to the back of the house where a white Volkswagen that was missing the right fender was parked.  (Id.)  Juárez began digging with a shovel and pickaxe but was unable to do it, so he called another man to help.  (Id.)  They threw the decedent's body in the hole and covered it with lime and dirt.  (Id.)  Juárez threatened to kill Coronado if he said anything.  (Id.)

Juárez then told Coronado details about his plan to kill his father when his father got home.  (Id. at 114-115.)  Coronado heard the carport open and believed Juárez's father had arrived.  (Id. at 115.)  Coronado was scared and ran.  (Id.)  He ran into Juárez's father and heard Juárez firing.  (Id.)  Coronado did not know what happened next because he ran away, but, the following day, on February 6, 2019, Coronado noticed Juárez trying to sell the white Cherokee and his father's dark green Cherokee.  (Id.)

### c.    Statement of G.B.J.S.

On February 18, 2019, Mexican authorities conducted an interview of the decedent's husband and Juárez's father, G.B.J.S.  (ECF No. 18 at 125-27.)  In his statement, G.B.J.S. stated he and the decedent got up at approximately 3:45 a.m. when Juárez arrived home.  (Id. at 126.)  The decedent was upset because Juárez had brought a girl home, but G.B.J.S. said it was okay.  (Id.)  G.B.J.S. left for work, and arrived by approximately 6:28 a.m.  (Id.)  At approximately 12:00 p.m., G.B.J.S. tried calling the decedent, but her phone went directly to voicemail.  (Id.)  G.B.J.S. arrived home at approximately 4:00 p.m.  (Id. at 127.)  G.B.J.S. opened the garage door, went inside, sat on the couch, and noticed the house was in disarray and items were missing.  (Id.)  He heard the garage door open, and Juárez arrived in a truck.  (Id.)  G.B.J.S. asked Juárez about the decedent and Juárez said she got upset with him for playing PlayStation and left without saying anything.  (Id.)  G.B.J.S. went to the store and, when he returned, Juárez was in the backyard.  (Id.)  G.B.J.S. went to the bathroom and when he came out, he opened the door to Juárez's room where he found a man pointing a gun at him.  (Id.)  The man shot at G.B.J.S.  (Id.)  When G.B.J.S. went out the front door, Juárez helped him and took him to the authorities.  (Id.)

G.B.J.S. stated he did not know what happened to the decedent.  (Id.)

### d.    Statement of E.S.G.

On February 27, 2019, Mexican authorities conducted an interview of the decedent's sister, E.S.G.  (ECF No. 18 at 129-38.)  In her statement, E.S.G. stated the decedent had known Juárez since he was four years old, and she loved him as a son.  (Id. at 131.)  She relayed that Juárez did not go to school and did not have a job. E.S.G. surmised Juárez had moved into his father and stepmother's house because his mother could no longer tolerate his behavior.  (Id.)

In December 2018, the decedent told E.S.G. that Juárez had been taken from the house by authorities on several occasions for having guns on him, and that his father had paid bribes so Juárez would not be prosecuted.  (Id. at 132.)  The decedent also told E.S.G. that Juárez had legal problems in the United States and that G.B.J.S. had spent a large amount of money to pay his bail.  (Id.)  The decedent also told E.S.G. that when she previously asked Juárez why he was armed, he replied that he "like[d] to always carry a gun."  (Id.)

On February 5, 2019, E.S.G.'s husband received a text from a friend telling him that G.B.J.S. had been shot by a thief.  (Id.)  E.S.G. called the decedent and was sent directly to voicemail.  (Id. at 132-33.)  E.S.G. checked WhatsApp and saw that the decedent had last been online at 6:37 a.m. on February 5, 2019, which seemed unusual to E.S.G. because the decedent was always online.  (Id. at 133.)

On February 6, 2019, G.B.J.S. told E.S.G. he had last seen the decedent before he left for work on February 5, 2019, and did not know where she was.  (Id.)  The decedent was not at home when he arrived, and he heard noises in Juárez's room.  (Id.)  He went into the room, and a person he did not know shot him.  (Id.)  Juárez told G.B.J.S. that Juárez had argued with the decedent at 11:00 a.m. on February 5, 2019 and that he did not know the person who shot G.B.J.S.  (Id.)

On February 7, 2019, E.S.G. went to the decedent's house with authorities, who interviewed Juárez.  (Id. at 134.)  Juárez claimed that the decedent had left the house following an argument with G.B.J.S.  (Id.)  E.S.G. was suspicious because it was different from what G.B.J.S. had told E.S.G், and because the decedent would have called or stayed with her family.

1    (<u>Id.</u>)

2        On February 16, 2019, E.S.G. posted on Facebook asking for information about the

3    decedent's whereabouts.  (<u>Id.</u>)  That night, she received a call from an anonymous individual

4    who stated he knew the decedent was missing, that she was "buried by her house," and that

5    E.S.G. should "look behind the house."  (<u>Id.</u>)

6        On February 17, 2019, E.S.G. received a Facebook message from a woman claiming to

7    be Juárez's ex-girlfriend, M.T.  (<u>Id.</u> at 135.)  E.S.G. called M.T., who said that when she asked

8    Juárez about the decedent, he told her "she asked for it, she tried to clean my old man's money

9    out."  (<u>Id.</u>)

10        On February 22, 2019, E.S.G. received a call from an anonymous individual who said a

11   man named "El Genser," also named Cristopher Rodrigo or Rodriguez, confessed he was present

12   the day decedent was killed.  (<u>Id.</u>)  El Genser reportedly told the caller that Juárez said the

13   decedent "will not get to keep my dad's land lots" before he shot her eye.  (<u>Id.</u>)  The person said

14   two other individuals were present and Juárez buried the decedent in the back of the house.  (<u>Id.</u>)

15        On February 22, 2019, E.S.G. called  G.B.J.S. and asked him whether he believed Juárez

16   had harmed the decedent.  (<u>Id.</u>)  G.B.J.S. replied "of course" he did.  (<u>Id.</u>)

17        On February 24, 2019, E.S.G., her father (J.E.G.M.), her sister (K.), her brother-in-law,

18   and two others went to the decedent's house to dig in the backyard.  (<u>Id.</u> at 136.)  They saw a

19   muddy shovel and pickaxe behind the house and noticed the soil under a white Volkswagen had

20   been disturbed.  (<u>Id.</u>)  The group moved the vehicle and took turns digging holes until they found

21   white powder, boards, a blanket, then a foot with a black boot, which E.S.G. recognized as the

22   decedent's.  (<u>Id.</u>)  They called the authorities, who confirmed it was the decedent's body.  (<u>Id.</u>)

23        **e.    Statement of Decedent's Father, J.E.G.M.**

24        On February 26, 2019, Mexican authorities conducted an interview of the decedent's

25   father, J.E.G.M.  (ECF No. 18 at 141-47.)  In his statement, J.E.G.M. stated the decedent had

26   been living with Juárez for approximately 15 years, "so [Juárez] was practically her relative; they

27   trusted each other."  (<u>Id.</u> at 146.)  He described decedent and Juárez's relationship as good for

28   years until Juárez began using drugs.  (<u>Id.</u>)  J.E.G.M. reported Juárez had a problem with the

decedent because he wanted his father's house, assets, and possessions.  (Id.)

J.E.G.M. last heard from the decedent on WhatsApp on February 4, 2019.  (Id.)  On February 5, 2019, he received a call that G.B.J.S. had been attacked.  (Id. at 143.)  J.E.G.M. called G.B.J.S. and asked where the decedent was because he nor her sisters could get in touch with her.  (Id.)  G.B.J.S. told J.E.G.M. that when he arrived home, Juárez told him he had a "strong argument" with the decedent earlier that morning and that she had taken belongings and left in her white Jeep Cherokee.  (Id. at 143-44.)

On February 24, 2019, J.E.G.M. went to the decedent's house after E.S.G. told J.E.G.M. she had received a phone call informing her that the decedent was buried in the backyard.  (Id. at 144.)  In the backyard, J.E.G.M. observed an abandoned white Volkswagen, four shovels, a pole, and a pickaxe.  (Id.)  J.E.G.M. began digging under the Volkswagen, and, about a foot deep, the pickaxe came out of the ground stained with lime.  (Id.)  The group continued digging, found more lime, then a beige or light brown blanket, and then a foot with a black, boot-type slipper on, which he recognized as belonging to the decedent.  (Id.)

### f.    Autopsy Report

On February 25, 2019, a medical examiner conducted an autopsy of decedent's body.  (ECF No. 18 at 149-56.)  The decedent was found to have a wound that was characteristic of being produced by a firearm projectile in the face near her right eye.  (Id. at 151-52, 153.)  It was estimated that the decedent died 20 to 30 days before the autopsy was conducted.  (Id. at 155.)  The medical examiner concluded the cause of death was "encephalic laceration secondary to perforating cranium wound produced by firearm projectile (bullet)."  (Id.)

### g.    Photographic Identification Proceedings

On May 17, 2019, Mexican authorities conducted identification proceedings with A.J.V.L., E.S.G., and J.E.G.M.  (ECF No. 18 at 158-80.)  A.J.V.L. positively identified a photograph of Juárez as the man she witnessed shoot the decedent in the face, by her eyes.  (Id. at 158-64.)  E.S.G. and J.E.G.M. also positively identified a photograph of Juárez.  (Id. at 166-80.)

### 2.    Analysis

The Government contends that the evidence offered by Mexico is competent to support

probable cause that Juárez committed the offense charged. Juárez argues that the evidence submitted is insufficient to establish probable cause that he killed the decedent. Juárez first argues that the statements of the two eyewitnesses, Coronado and A.J.V.L., contradict each other and G.B.J.S.'s statement, which undermines the competency and reliability of their statements. Juárez also argues that no physical evidence has been submitted that supports any finding that he committed the offense of femicide on February 5, 2019.

In addressing Juárez's arguments regarding the eyewitness statements, the Court is guided by its limited role in extradition proceedings. "[I]t is not [this court's] role to determine whether there is sufficient evidence to convict the accused" or to "weigh conflicting evidence and make factual determinations." Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986). Rather, the Court is tasked only with determining whether probable cause exists to believe that the fugitive committed the offense charged. See Santos, 830 F.3d at 991. Probable cause is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Probable cause exists where the known facts and circumstances are sufficient to warrant a person of reasonable prudence that the individual committed the act accused. Ornelas, 517 U.S. at 696. In determining whether probable cause exists, the Court only determines whether any competent evidence has been presented to support the belief that the accused committed the charged offense. Quinn, 783 F.2d at 815; In re Extradition of Santos, 795 F.Supp.2d at 989 n.12.

Juárez argues that, as an initial matter, the Court should automatically question the reliability and competency of Coronado and A.J.V.L.'s statements because they were not made until 20 and 31 days, respectively, after decedent's murder and after her body was found. The Court disagrees. Eyewitness statements do not fail to constitute competent evidence merely because they were made weeks after the incident. Juárez does not challenge that the delay in time affected the most salient portion of Coronado and A.J.V.L.'s statements: that both saw Juárez shoot the decedent. The fact that both statements were provided weeks after the incident

1    and after the body was recovered may be a fruitful topic for cross-examination at trial, but the

2    delay alone does not cast a de facto shadow of unreliability over the substance of the statements

3    for probable cause purposes.  Even if it did, Coronado and A.J.V.L.'s statements shed light on

4    their respective delay in approaching the authorities, the veracity of which may also be fleshed

5    out before the trier of fact.  Both stated they were fearful of Juárez and had been threatened by

6    him more than once not to say anything.  (ECF No. 18 at 114, 115, 121, 122.)  A.J.V.L.

7    explained she went to the authorities because Juárez had gone to her house twice after the

8    incident, causing her to fear for her and her family's safety.  (Id. at 122.)  Coronado explained he

9    only went to the authorities after learning Juárez had "run away abroad."  (Id. at 116.)  That the

10   eyewitnesses' statements were made weeks after the incident could be seen as weaknesses in the

11   prosecution's case, but it does not alone deem them inherently unreliable for probable cause

12   purposes.

13          Juárez compares the 20 and 31 day timeframes between Coronado and A.J.V.L.'s

14   statements with that of his father's statement, which was made on February 18, 2019, or 13 days

15   after G.B.J.S. and his wife were shot.  Juárez describes G.B.J.S.'s statement as the "most reliable

16   account of what occurred on February 5, 2019," "a clear recollection of what occurred," and

17   "unimpeachable."  (ECF No. 20 at 6, 8.)  Juárez points to the portion of G.B.J.S.'s statement that

18   describes another man in the home after 4:00 p.m. on February 5, 2019, and that man, not Juárez,

19   shot G.B.J.S.  Juárez notes this statement is inconsistent with Coronado's statement that Juárez

20   shot G.B.J.S.  Juárez argues that, based on the statement of G.B.J.S., "who has no incentive to lie

21   at the time he was interviewed, it is evident that Mr. Coronado is lying when he states that it was

22   Mr. Juárez who shot at his father."  (Id. at 8.)

23          The Court rejects resolving Juárez's factual dispute regarding the weight and credibility of

24   G.B.J.S. and Coronado's purportedly conflicting statements.  To find Coronado is lying and thus

25   discount his statement, the Court must necessarily find G.B.J.S. is more credible.  That is a

26   matter for the trier of fact in Mexico.  Although the credibility of the witnesses and the weight to

27   be accorded to their testimony is within the province of the extradition judge, the Court may not

28   weigh conflicting evidence and make factual determinations.  Quinn, 783 F.2d at 815.  The

1   limited nature of these proceedings does not permit the Court to weigh G.B.J.S. and Coronado's

2   statements and, on the papers, find one is more credible than the other.

3          The Court also does not find, as Juárez suggests, that G.B.J.S.'s February 18, 2019

4   statement conflicts with Coronado and A.J.V.L.'s statements by implicating another individual,

5   not Juárez, in the decedent's murder.  G.B.J.S. states he left home in the early hours of February

6   5, 2019, leaving the decedent, Juárez, and a girl at the home, and arrived at work prior to 6:28

7   a.m. (ECF No. 18 at 126.)  At noon, G.B.J.S. attempted to call the decedent, but her phone went

8   to voicemail.  (Id.)  G.B.J.S. did not return home until approximately 4:00 p.m.  (Id. at 127.)

9   Contrary to Juárez's argument, G.B.J.S. does not provide *any* statement that implicates that

10  another individual killed his wife while he was at work.  Rather, he expressly told authorities that

11  he "[didn't] know what happened to [his] wife."  (Id.)  Notably, four days after this statement to

12  authorities, when asked by E.S.G. on February 22, 2019 whether he suspected Juárez "did

13  something" to the decedent, he responded "[o]f course I do, I actually talked to his mother and

14  she talked to his probation officer."  (ECF No. 18 at 135.)  Thus, even accepting that there are

15  inconsistencies in the evidence regarding who shot G.B.J.S. after 4:00 p.m. on February 5, 2019,

16  the eyewitness statements are consistent that Juárez was the individual that shot the decedent

17  earlier that morning.  Juárez is not charged with shooting G.B.J.S. in Mexico's extradition

18  request.  The only offense charged is femicide for the killing of decedent.  The conflicting

19  statements regarding who shot G.B.J.S. in no way explain away or obliterate the evidence that

20  two eyewitnesses saw Juárez shoot the decedent.

21         The Court also rejects Juárez's credibility challenge to A.J.V.L.'s statement.  Juárez points

22  out that Coronado implicated A.J.V.L. as being involved in the plan to steal from and/or shoot

23  the decedent.  However, in her statement to authorities, A.J.V.L. omitted any information about

24  her knowledge or involvement.  Juárez therefore avers that A.J.V.L.'s statement is unreliable for

25  purposes of this proceeding because it is "less than truthful and self-serving."  (ECF No. 20 at 9.)

26  Such factual disputes regarding the weight and credibility of evidence are reserved for trial in

27  Mexico.  See Matter of Extradition of Hector Manuel Lara Gutierrez, No. 16-cv-05061 PSG

28  DFM, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017) (rejecting fugitive's claim that the

1    eyewitness statement "border[ed] on incredible," and finding the statement satisfied probable

2    cause because "the circumscribed nature of this Court's inquiry does not permit the Court to

3    weigh the credibility of [the eyewitness's] statements."); Matter of Extradition of Acevedo, No.

4    ED CV 16-1766-R (KS), 2017 WL 3491749, at *8 n.4 (C.D. Cal. Aug. 11, 2017) (rejecting

5    fugitive's claim that an eyewitness statement "is suspect and more likely than not false," and

6    finding the statement satisfied probable cause because resolving factual disputes regarding the

7    weight and credibility of evidence are "beyond the scope of this extradition proceeding and are

8    properly reserved for trial in the requesting country.").  Further, the Ninth Circuit has held that

9    the self-incriminating statements of accomplices are sufficient to establish probable cause in an

10   extradition hearing.  Zanazanian v. United States, 729 F.2d 624, 627–28 (9th Cir. 1984) (citing

11   Curreri v. Vice, 77 F.2d 130, 132 (9th Cir. 1935); Eain v. Wilkes, 641 F.2d 504, 510 (9th Cir.

12   1981) cert. denied, 454 U.S. 894).  The fact that A.J.V.L. may have been aware of or involved in

13   a plan to steal from and/or shoot the decedent is the type of evidence that can be argued to the

14   trier of fact to impeach A.J.V.L.'s credibility, but it does not obliterate the evidence of probable

15   cause.

16        Although Juárez identifies additional inconsistencies between Coronado and A.J.V.L.'s

17   statements, such as what time A.J.V.L. arrived at Juárez's home in the morning and whether

18   A.J.L.V. was with Juárez when he picked up Coronado at 6:00 a.m., these inconsistencies are not

19   so significant that they render all of Coronado and A.J.V.L.'s statements unreliable.  See In re

20   Salazar, No. 09-mj-2545-BLM, 2010 WL 2925444, at *11 (S.D. Cal. July 23, 2010).  The Court

21   finds that largely what Juárez characterizes as inconsistencies in the witness statements are the

22   types of inconsistencies that will go to the weight that the trier of fact should consider or

23   arguments as to the interpretation of the evidence.  Critically, Coronado and A.J.V.L. are

24   consistent in their accounts that they saw Juárez shoot the decedent in the face near her eyes.

25   Although Coronado and A.J.V.L.'s statements have weaknesses due to their delayed reporting,

26   involvement, and some inconsistent details, the Court finds their statements have sufficient

27   indicia of reliability based upon corroborating circumstances to constitute competent evidence

28   that supports the belief that Juárez committed the charged offense.

Additionally, Juárez argues that the government has not provided any physical evidence that ties Juárez to the decedent's murder. For example, Juárez points out that G.B.J.S. told authorities that he sat on the couch when he returned from work on February 5, 2019 and made no reference to blood or blood spatter in the living room or on the couch. Juárez infers that this suggests the shooting did not occur where A.J.V.L. and Coronado said it did. However, G.B.J.S. does not make an affirmative statement that he did *not* see any biological material when he sat on the couch. That G.B.J.S. failed to make any observation related to biological material can be argued to the trier of fact or addressed in cross-examination, but the omission does not explain away the existing probable cause in this matter.

Juárez also points out that the record omits any evidence that the murder weapon was recovered; that no evidence was submitted identifying what caliber of firearm was used; and no mention is made that any casings were recovered or tested for DNA or fingerprints. (ECF No. 20 at 10-11.) However, "the country seeking extradition is not required to produce all its evidence at an extradition hearing and it is not our role to determine whether there is sufficient evidence to convict the accused." Quinn, 783 F.2d at 815; Santos, 830 F.3d at 991 ("Foreign states requesting extradition are not required to litigate their criminal cases in American courts."). Rather, probable cause exists "if there is *any* competent evidence in the record to support it." Then, 92 F.3d at 854 (emphasis added). There is no requirement that there be physical evidence linking Juárez to the killing for probable cause to exist that he committed the crime charged. See Bozilov v. Seifert, 983 F.2d 140, 143 (9th Cir. 1992) (finding an uncorroborated witness statement can establish probable cause); In re Extradition of Singh, No. 01-6215 OWW, 2005 WL 3030819, at *40 (E.D. Cal. Nov. 9, 2005) ("Eye-witness testimony, if accepted, is sufficient to extradite a fugitive.")

Here, the Government has presented two eyewitness statements and corroborating evidence. A.J.V.L. and Coronado both describe that Juárez planned to steal money and vehicles from the decedent's home. (ECF No. 18 at 112, 120.) Both witnessed Juárez walk up to the decedent as she was seated on the couch and shoot her in the face near her eyes with a handgun. (Id. at 113, 120-21.) Both witnesses describe wrapping the decedent's body in white and

brown/beige blankets and, with help from a third man, burying the body with lime and dirt underneath a white Volkswagen with a missing fender or grill in the backyard of decedent's house. (Id. at 114, 121.) A.J.V.L. and Coronado's statements are consistent with how and where E.S.G. and J.E.G.M. found the decedent's body wrapped in a brown/beige blanket and buried with lime under a white Volkswagen in decedent's backyard. (Id. at 136, 144.) Additionally, A.J.V.L. and Coronado's statements regarding the manner in which they saw Juárez shoot the victim in the face near the eyes are corroborated by the findings of the medical examiner who concluded the decedent died from a bullet travelling through her head. (Id. at 155-53, 155.) A.J.V.L. also positively identified Juárez as the decedent's shooter in a photographic identification proceeding. (Id. 158-64.) Another witness, E.S.G., recounted the decedent telling her Juárez had previously been found in possession of guns and had told the decedent that he liked to always carry a gun. (Id. at 132.) E.S.G. also spoke with Juárez's ex-girlfriend, to whom Juárez relayed that the decedent "asked for it" and that she "tried to clean [his] old man's money out." (Id. at 135.) The evidence also includes descriptions of Juárez and the decedent's relationship by E.S.G. and J.E.G.M. as one beginning when Juárez was four years old—a kinship through marriage lasting approximately fifteen years—and one where they lived together, "trusted each other," and "were practically [] relative[s]." (Id. at 131, 146.) This evidence is competent to support probable cause to believe that Juárez intentionally deprived his stepmother of her life for gender-related reasons, as defined by Article 129 of the Baja Criminal Code.

Given the totality of evidence provided for the limited purpose of these extradition proceedings, the Court finds there is probable cause to believe that Juárez committed the offense for which extradition is sought.

## IV.

## FINDINGS AND CERTIFICATION

Accordingly, for the foregoing reasons, the Court makes the following findings:

1.     This Court has subject matter jurisdiction over, and the undersigned is authorized to conduct, extradition proceedings pursuant to Title 18 U.S.C. § 3184 and Local Rule 302(b)(8);

2.  This Court has personal jurisdiction over Aaron Seth Juárez, found in this District pursuant to a complaint filed by the United States in response to the formal request by the Government of Mexico for extradition of Aaron Seth Juárez;

3.  There is a valid extradition treaty between the United States of America and Mexico ("Treaty") that has at all relevant times been in full force and effect;

4.  Aaron Seth Juárez is the person named in the extradition request and is the person arrested and brought before the Court;

5.  Aaron Seth Juárez has been charged in Mexico with femicide, as provided for and penalized by Article 129 of the Criminal Code of the State of Baja California, Mexico;

6.  The charge of femicide constitutes an extraditable offense within the meaning of the Treaty, is substantially analogous to laws in the United States of America, and is punishable in both the United States and Mexico by imprisonment for a term exceeding one year;

7.  There is competent evidence establishing probable cause to believe that Aaron Seth Juárez committed the charged offense; and

8.  The documents required have been presented in accordance with the laws of the United States of America and the Treaty and have been certified by the principal consular officer of the United States of America in Mexico.

Accordingly, pursuant to 18 U.S.C. § 3184 and the above findings, the Court hereby CERTIFIES to the Secretary of State that Aaron Seth Juárez is extraditable to Mexico for the charged crime of femicide.

IT IS FURTHER ORDERED that Aaron Seth Juárez remain committed to the custody of the United States Marshals Service pending further decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186.

1     The Clerk of the Court is DIRECTED to forward a certified copy of this Certification to

2   the Secretary of State (to the attention of the Office of the Legal Adviser).

3

4   IT IS SO ORDERED.

5   Dated:   **March 11, 2025**

         STANLEY A. BOONE
6        United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28